# United States District Court
# District of Massachusetts

UNITED STATES OF AMERICA,
   Plaintiff,

    v.        CIVIL ACTION NO. 03-10153-RBC

$62,552.00 IN UNITED STATES
   CURRENCY,
    Defendant.

DELIA J. BAEZ,
   Claimant.

## *FINDINGS OF FACT*
## *AND CONCLUSIONS*
## *OF LAW AFTER NON-JURY TRIAL*

COLLINGS, U.S.M.J.

### I.  Introduction

On January 23, 2003, the United States filed a Complaint for Forfeiture

in Rem (#1) seeking the forfeiture of $62,552.00 which was seized at Logan

International Airport on August 13, 2002.  According to the Affidavit of Mark

K. West (#1, Exh. A), the money was found in five envelopes in the carry-on

luggage which the claimant, Delia J. Baez ("Baez" or "the claimant") and her companion, one Jose DelCarmen Geronimo ("Geronimo"), had with them as they attempted to pass through security to board an American Airlines flight to the Dominican Republic. The United States alleges that the "[c]urrency constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, in violation of Title 21, proceeds traceable to such an exchange, and/or money used or intended to be used to facilitate a violation of Title 21." (#1, pp. 1-2) As such, the Government avers that it is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). *Id.* Baez has made claim to the funds. A non-jury trial was held on December 3, 2004.[1]

## II. *Findings of Fact*

First, the Court finds as fact those facts which are denoted as undisputed and are stipulated to as set forth in the Parties' Submission of Disputed and Undisputed Facts (#30).[2] Second, with respect to those facts which are listed

---

[1]

"Tr." shall be used to denote references to the transcript of the non-jury trial. "Exh." shall be used to identify the exhibits introduced during the non-jury trial.

[2]

After agreeing at the beginning of the trial that the undisputed facts contained in the Parties' Submission, Etc., (#30) could be entered into evidence as stipulated facts, claimant's counsel at the time of final argument stated that he never intended to stipulate to the first sentence of paragraph 3. (#30, p. 1, ¶ 3) (Tr. 130) The Court instructed claimant's attorney that his only remedy was to file a motion to strike the specific stipulation. (Tr. 135) The docket reveals that no motion was filed. In any event, it does not matter because the Court gives no weight to that particular stipulated fact because there is no indication of the source of the information or whether the source was reliable.

as not being subject to stipulation on pages 1 through 14 of the Parties' Submission (#30), the Court makes the following findings using the numeration in the submission:

12.   I find that Ms. McKenna did so testify at a deposition, but I do not make any further finding on the subject matter of the paragraph. Ms. McKenna did not testify at trial, and the Court has no way of determining the source of her knowledge. For all the Court knows she may not have personal knowledge of the facts; rather they may be based on statements of others. In short, the Court finds that she so testified, but the Court does not give any weight to the testimony.

14. - 18.   The Court finds that the facts set forth in paragraphs 14 through 18 have been proven by the evidence at trial. The only objection is that the evidence is not relevant; the Court found at trial that the evidence was relevant on the issue of the claimant's credibility.

Third, the Court makes the following additional findings of fact:

1.   On August 13, 2002, the claimant and Geronimo arrived at Logan International Airport, Boston, Massachusetts in order to board an American Airlines Flight to Santo Domingo, Dominican Republic. (Tr. 65, 79)

2. Baez checked bags but had two purses which she intended to carry on

3

the plane. A larger one contained, *inter alia,* $62,000 in cash; a smaller one contained $552.00 in cash. (Tr. 65) The cash was contained in five envelopes. (Exhs. 4 through 8) (Tr. 24, 65-66)

3. When Baez went through security, she asked for a form on which to declare that she was taking currency out of the country. (Tr. 79-82) She was told that she could get the form in a small room after she passed through security. (Tr. 81) Her two carry on bags went through the screening machine without incident. (Tr. 82)

4. When Baez reached the small room, she was given the form. Because she needed to count the money in order to get the precise amount she was carrying, she laid the money out on a table in the room and began counting it. (Tr. 82) The money was out on the table. (Tr. 84) The claimant had partially filled out the form. (Exh. 22)

5. While this was occurring, a State Police Officer Mark West ("Trooper West") appeared to question the claimant about the money. The claimant stated that the money was hers. (Tr. 83) After questioning the claimant, Trooper West seized the currency and gave the claimant a receipt. (Tr. 21-23) The claimant was told that the address she had given, i.e., 3383 Washington

Street, Jamaica Plain, Massachusetts, was linked to drugs. (Tr. 86) The claimant denied that the address was linked to drugs after she either rented or owned it. (Tr. 86)

6.   The claimant and Geronimo were allowed to depart on a later flight and, in fact, flew to Santo Domingo. (Tr. 85)

7.   Trooper West worked with a drug-sniffing dog named Tracer who was trained to detect the odor of marijuana, cocaine, heroin and methamphetamine. (Tr. 15)

8.   At the time, i.e., August 13, 2002, Tracer had been trained by Trooper West (Exh. 2) and had been certified for the four substances. (Exh. 3) (Tr. 17-19)

9.   After the seizure, Trooper West put the five envelopes and cash in a manila envelope and placed it in a room with three other envelopes which contained shredded currency from the Federal Reserve Bank. (Tr. 23) When Tracer was let into the room, in a matter of seconds she reacted to the manila envelope in which the claimant's envelopes and cash were located. (Tr. 24) She did not react to the other three envelopes. (Tr. 27)

10.  Since Tracer reacts to the *odor* of one or more of the four substances,

and the odors dissipate over time, one or more of the envelopes and/or the currency which the claimant was carrying was exposed to one of the four substances within the recent past. (Tr. 35)

11.    The Dominican Republic is a source for drugs, drug activity and money laundering of drug proceeds. (Tr. 22, 31) The same is true of other countries in South America and the Caribbean. (Tr. 31)

### III. The Law

#### A. An Overview

Enacted in 2000, the Civil Asset Forfeiture Reform Act ("CAFRA") applies in the instant case given that the Government's verified complaint for forfeiture in rem was filed on January 23, 2003. *U.S. v. $21,510.00 In U.S. Currency*, 144 Fed. Appx. 888, 889 (1 Cir., 2005) (CAFRA "applies to civil forfeiture cases which . . . were commenced on or after August 23, 2000."). Among other changes, this legislation altered the burden of proof in civil judicial forfeiture proceedings: "Since the Civil Asset Forfeiture Reform Act of 2000 . . . the Government's burden to prove that certain property is subject to forfeiture was 'increased . . . from mere probable cause (the old standard) to the preponderance of the evidence.'" *U.S. v. 6 Fox Street*, 480 F.3d 38, 42 (1 Cir.,

2007)(footnote omitted)(quoting *U.S. v. Lopez–Burgos*, 435 F.3d 1, 2 (1 Cir., 2006); *$21,510.00 In U.S. Currency*, 144 Fed. Appx. at 889; *U.S. v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9 Cir., 2002).[3] In other words, "the government carries the burden of proving by a preponderance of the evidence that the Funds were either the proceeds of an illegal drug transaction, or were intended to facilitate such a transaction. 18 U.S.C. § 983(c)(1); 21 U.S.C. § 881(a)(6)." *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00),* 730 F.3d 711, 716 (7 Cir., 2013). "To meet this burden, the government may rely on evidence obtained after the filing of the complaint for forfeiture." *$21,510.00 In U.S. Currency*, 144 Fed. Appx. at 889;

---

[3] Despite this change,

> [i]t is appropriate to rely upon forfeiture case law decided before the enactment of CAFRA. Although those cases applied the less-burdensome probable cause standard, '[f]actors that weighed in favor of forfeiture in the past continue to do so now - with the obvious caveat that the government must show more or stronger evidence establishing a link between forfeited property and illegal activity.'

*$21,510.00 In U.S. Currency*, 144 Fed. Appx. at 890 n.2 (quoting *U.S. v. Funds in Amount of $30,670.00*, 403 F.3d 448, 469 (7 Cir., 2005)).

Claimant Delia Baez relies on a First Circuit decision, *U.S. v. $250,000 in United States Currency*, 808 F.2d 895, 897 (1 Cir., 1987), that predates CAFRA and so employed the former standard of proof, to wit, probable cause, rather than preponderance of the evidence. To the extent the case was cited for the applicable standard of proof, it is not longer applicable. *See U.S. v. Lopez–Burgos*, 435 F.3d 1, 2 (1 Cir., 2006) ("In support of his motion [to dismiss], Lopez Burgos invoked statutorily superseded (and therefore legally irrelevant) authority requiring the government to plead facts sufficient to establish probable cause to believe that the currency is subject to forfeiture. *See U.S. v. One Lot of U.S. Currency ($36,634)*, 103 F.3d 1048, 1053 (1st Cir.1997) (interpreting the since repealed 19 U.S.C. §1615).").

Title 18 U.S.C. 983(c)(2).   Further, where "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." *See* Title 18 U.S.C. § 983(c)(3); *Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00),* 730 F.3d at 716.

There is no dispute that United States currency may be subject to forfeiture. *See* 21 U.S.C. §881(a)(6)[4].  In this case the Government contends that the monies seized are related to illegal drug trafficking.

> In order to establish that the seized funds were the proceeds of, or intended to facilitate, an illegal drug transaction, the United States must demonstrate a

---

[4] This statute provides in pertinent part:

(a) Subject property

The following shall be subject to forfeiture to the United States and no property right shall exist in them:
*****
(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

Title 21 U.S.C. §881(a)(6).

> nexus between the seized property and illegal drug activity. *See [U.S. v.] $506,231*, 125 F.3d [442,] 451 [(7 Cir., 1997)].

*U.S. v. $30,670 in U.S. Funds*, 2002 WL 31093587, *2 (N.D. Ill., Aug. 5, 2002), *aff'd*, 403 F.3d 448 (7 Cir., 2005); *U.S. v. One Lot of U.S. Currency ($36,634)*[5], 103 F.3d 1048, 1053 n.6 (1 Cir., 1997)("This circuit has most recently described the government's burden as being one of showing a 'nexus.' *See [U.S. v. One Lot of U.S. Currency] $68,000*, 927 F.2d [30] at 32 (1st Cir. 1991) Earlier cases used the term 'substantial connection.' *United States v. 28 Emery St.*, 914 F.2d 1, 3-4 (1st Cir. 1990) (citing cases). We need not resolve whether, as some cases suggest, 'nexus' means something less than 'substantial connection.' *Cf. United States v. West Side Building Corp.*, 58 F.3d 1181, 1188 n. 13 (7th Cir.1995) (comparing the two standards and endorsing 'nexus' standard); *United States v. Daccarett*, 6 F.3d 37, 55-56 (2d Cir.1993) (same), *cert. denied*, 510 U.S. 1191, 510 U.S. 1192, and 511 U.S. 1030 (1994). The facts adduced here are more than adequate to establish a 'substantial connection.'"); *cf. U.S. v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 196 (2 Cir., 2013) ("CAFRA also replaced the existing "'nexus standard'" with the more rigorous 'substantial connection' test, which we had specifically declined to adopt in the pre-CAFRA era. *See United States v. Daccarett*, 6 F.3d 37, 55–56 (2d Cir.1993); *see also* 18 U.S.C. § 983(c)(3) (effectively abrogating *Daccarett* ).").

"After CAFRA, in order for the government to prove that property used to facilitate a drug transaction is subject to forfeiture, it must prove there is a substantial connection between the property and the crime. *See* 18 U.S.C. §

---

[5] The *One Lot of U.S. Currency ($36,634)* decision has been superceded by statute. In *Lopez-Burgos*, the First Circuit recognized that "[a]lthough CAFRA increased the government's burden of proof at trial from mere probable cause (the old standard) to the preponderance of the evidence, *see* 18 U.S.C. §983(c)(1), it made clear that the pleading requirements imposed by cases such as *One Lot of U.S. Currency ($36,634)* no longer apply. It did so by stating that no civil forfeiture complaint may be dismissed because the government lacked sufficient evidence of forfeitability at the time of filing, *see* 18 U.S.C. § 983(a)(3)(D), and that the government may use evidence gathered after filing to meet its burden of proof, *see* 18 U.S.C. §983(c)(2)." *Lopez-Burgos*, 435 F.3d at 2.

983(c)(3)." *U.S. v. One Parcel of Real Property with Buildings, Appurtenances and Improvements k/a 45 Claremont St., Located in City of Central Falls, R.I.,* 395 F.3d 1, 6 n. 5 (1 Cir., 2004). The substantial connection "requirement will generally be satisfied if the items under forfeiture are shown to be proceeds of the illegal activity, derived from such proceeds or used to facilitate such activity." *U.S. v. Real Property with any Improvements Thereon Located at 40 Clark Road, Sandisfield, Mass.,* 52 F. Supp.2d 254, 261 (D. Mass.,1999).

## B. The Evidence of A Dog's Positive Alert

At the conclusion of the trial, the Court ordered the parties to submit briefs on two legal issues. The first of these issues was whether the Government can meet its burden of proof on the question of whether the monies were related to narcotics trafficking based on the positive sniff of a dog. The First Circuit has written that "[t]he existence of probable cause based on an alert by a drug dog depends upon the dog's reliability." *U.S. v. Owens,* 167 F.3d 739, 749 (1 Cir.), *cert. denied,* 528 U.S. 894 (1999) (citing *U.S. v. Race,* 529 F.2d 12, 14 (1 Cir., 1976)); *accord U.S. v. Brown,* 500 F.3d 48, 57 n. 3 (1 Cir., 2007)*; U.S. v. Lopez,* 380 F.3d 538, 544 n. 4 (1 Cir., 2004), *cert. denied,* 543 U.S. 1074 (2005). When determining a dog's reliability, such factors as training,

certifications and re-certifications, length of service, and record of performance are considered. *See U.S. v. Funds In The Amount Of $30,670.00*, 403 F.3d 448, 460-462 (7 Cir., 2005).

In a case where a narcotics-detection dog alerted to a bag of money that had been seized, the First Court wrote:

> Finally, the dog's reaction, indicating that [claimant's] money had at some point come into contact with narcotics, weighs some, but not a great deal, on the scale. *See United States v. $30,060*, 39 F.3d 1039, 1042 (9th Cir.1994) (declining to find probable cause where government essentially based entire case on dog reaction). 'Even though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's alert still retains some probative value. Ordinary experience suggests that currency used to purchase narcotics is more likely than other currency to have come into contact with drugs.' *United States v. Saccoccia*, 58 F.3d 754, 777 (1st Cir.1995), *cert. denied*, 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996).

*One Lot of U.S. Currency ($36,634)*, 103 F.3d at 1055-56; *accord $21,510.00 In U.S. Currency*, 144 Fed. Appx. at 890.

In 2005, the Seventh Circuit in *Funds In The Amount Of $30,670.00*, 403 F.3d at 455-462, wrote extensively about the weight to be given to an alert by a narcotics dog. The issue was framed as follows:

> [I]t is a matter of some scientific debate whether dogs

alert only to cocaine itself or rather to the odor of a cocaine byproduct, such as methyl benzoate. Thus the critical question is not whether most currency in general circulation is tainted with cocaine, but whether the cocaine itself is what triggers dog alerts to currency. If properly trained dogs alert to cocaine and not another substance or a byproduct of cocaine, then Calhoun's argument is stronger - dog alerts to currency would have little or no probative weight if it can be shown that most currency is 'innocently' tainted with detectable levels of cocaine. On the other hand, if dogs alert to methyl benzoate as opposed to cocaine per se, and the byproduct is volatile enough to evaporate from the currency within a short period, then a dog alert likely would be more probative because even assuming that most currency is tainted with particles of cocaine, dogs will not alert to it unless it contains the odor of methyl benzoate.

*Funds in Amount of $30,670*, 403 F.3d at 455.

The Court noted that current scientific studies seem to support the finding that trained narcotics dogs "alert to methyl benzoate as opposed to cocaine per se, and the byproduct is volatile enough to evaporate from the currency within a short period [so that] a dog alert likely would be more probative." *Id.* In a more recent decision, the Seventh Circuit clarified that

our holding in *$30,670* was based upon the empirical information provided in [that] case. Nothing in *$30,670* precludes [the owner of the currency] from offering expert evidence attacking Dr. Furton's research and challenging the conclusion that drug-dog alerts to

> currency are probative of whether the most recent holder of the currency was involved with illegal narcotics activity.

*U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 720 (7 Cir., 2013)(footnote, internal citations and quotation marks omitted).

Whether the First Circuit would adopt the view that a dog's positive sniff is entitled to more probative weight is unknown. But in any event, a positive drug alert by a dog is only one element to be considered with all of the evidence as a whole to determine whether the government has met its burden. *See, e.g., Funds in Amount of $30,670.00*, 403 F.3d at 469 ("Factors that weighed in favor of forfeiture in the past continue to do so now - with the obvious caveat that the government must show more or stronger evidence establishing a link between forfeited property and illegal activity."); *One Lot of U.S. Currency ($36,634)*[6], 103 F.3d at 1054 ("Courts review each piece of evidence only to determine whether it is probative, not whether it establishes probable cause standing alone. Even where no particular circumstance is conclusive, it is the aggregate of the facts that is examined." (internal citations and quotation marks

---

[6]

Again, although this case has been superceded by statute, as acknowledged by the Seventh Circuit, this would not seem to impact the manner in which the Court is to weigh the evidence.

omitted)); *U.S. v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216-17 (9 Cir., 2001)("In addition to the undisputed evidence of the sophisticated dog sniff, there are numerous other undisputed facts which, in the aggregate, establish probable cause to believe that the money seized from [claimant] was to be (or had been) used in drug-related activity.")   For example, the Court should also consider that Baez had in her possession in large amount of cash:

> [Claimant] was also carrying an extremely large sum of cash.  *See United States v. $37,780*, 920 F.2d 159, 163 (2d Cir.1990) ("[Claimant] was carrying an extremely large sum of cash [$37,780] in small denominations, demonstrating that he was either inordinately carefree with his money or was involved in illegal activity."); *United States v. $175,260*, 741 F. Supp. 45, 47 (E.D.N.Y.1990) (carrying $175,000 in airport contributes to probable cause for forfeiture because that is far more than the average person carries). Given the other facts here, it is not fatal to the government's case that [Claimant] was not carrying drugs or drug paraphernalia at the time the money was seized from him. *See United States v. $215,300*, 882 F.2d 417, 419 (9th Cir.1989) ("Carrying a large sum of cash is 'strong evidence' of [a connection to illegal drug activity] even without the presence of drugs or drug paraphernalia." (quoting *United States v. $83,310.78*, 851 F.2d 1231, 1236 (9th Cir.1988)), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990)).

*One Lot of U.S. Currency ($36,634)*, 103 F.3d at 1055; *see also $22,474.00 in U.S. Currency*, 246 F.3d at 1216.

So, too, should the Court note that Baez intended to travel to a destination known as a place to launder drug money. *$22,474.00 in U.S. Currency,* 246 F.3d at 1216 ("While drug courier profiling alone is insufficient to establish probable cause, courts have used it as a factor in considering the totality of the circumstances. *See* [*United States v. $129,727.00 in U.S. Currency*, 129 F.3d 486,] 490-491 [(9th Cir. 1997), *cert. denied*, 523 U.S. 1065 (1998)]; [*U.S. v.*] *$215,300*, 882 F.2d [417] at 419 [(9th Cir. 1989), *cert. denied*, 497 U.S. 1005 (1990)] (finding claimant's Miami destination, a 'well know center of illegal drug activity,' was probative of probable cause when combined with other circumstances.))."

C.  The Law Re: a Witness Invoking the Fifth Amendment at Deposition

The second issue is whether a non-party's invocation of the Fifth Amendment may be used to draw a negative inference against a party.[7]  It has been stipulated that "[d]uring his deposition in this case, Geronimo repeatedly refused to answer questions related to this trip, the seized currency, or the facts surrounding the seizure of the money, asserting his Fifth Amendment right against self-incrimination." (#30, p. 1, ¶ 2)

---

[7]

The Court notes that claimant's counsel did not brief this issue post-trial. *See #37.*

At the outset, it is clear that, as distinguished from the criminal context,

> the prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil cause.' 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961).

*Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

The Second Circuit has written that "[a]lthough *Baxter* focused on the invocation of the privilege by parties, '[a] non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree.' *RAD Servs., Inc. v. Aetna Casualty & Sur. Co.*, 808 F.2d 271, 275 (3d Cir.1986)." *LiButti v. U.S.*, 107 F.3d 110, 121 (2 Cir., 1997). The Court concluded that "the circumstances of a given case, rather than the status of a particular non-party, is the admissibility determinant." *LiButti*, 107 F.3d at 121 (footnote omitted).

The Eleventh Circuit has recently had occasion to survey the law in this area and so shall be quoted at some length:

> In civil cases, however, the Supreme Court has said that 'the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify in response to probative evidence offered against them.' *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). 'Th[is] rule

16

allowing invocation of the privilege [by civil litigants], though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed.' *Mitchell v. United States*, 526 U.S. 314, 328, 119 S. Ct. 1307, 1315, 143 L. Ed.2d 424 (1999).

Spinosa's status as a nonparty witness, rather than a litigant, adds a wrinkle that has not been considered by either the Supreme Court or this court. When a party remains silent in the face of accusation, his silence is indicative of the reliability of the adverse inference drawn against him 'if it would have been natural under the circumstances to object to the [accusation] in question.' *Baxter*, 425 U.S. at 319, 96 S.Ct. at 1558 (internal quotation marks omitted). However, a nonparty witness like Spinosa may invoke the privilege for a variety of reasons that are unrelated to the possibility of self-incrimination; for instance, a nonparty may purposefully choose not to contradict incriminating evidence in order to 'saddle a defendant with liability by insinuation, particularly where the chance of prosecution of the witness is slim.' Charles H. Rabon, Jr., Note, Evening the Odds in Civil Litigation: A Proposed Methodology for Using Adverse Inferences When Nonparty Witnesses Invoke the Fifth Amendment, 42 Vand. L. Rev. 507, 534 n. 189 (1989); *F.D.I.C. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 978 (5th Cir.1995) ('The concern is that a non-party who stands in no special relationship to the party at the time of trial may purposefully invoke the privilege solely to discredit the party.'). Because the witness cannot be made to explain why the privilege has been invoked, the reliability of the adverse inference drawn from his silence is limited. *Cf. Brink's Inc. v. City of New York*,

717 F.2d 700, 716–17 (2d Cir.1983) (Winter, J., dissenting) (analogizing nonparties' invocations of the privilege to hearsay evidence).

Mindful of this potential for inaccuracy and unfairness, other circuits have held that the admissibility of a nonparty's invocation of the Fifth Amendment privilege against self-incrimination and the concomitant drawing of adverse inferences should be considered 'on a case-by-case basis.' *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1481 (8th Cir.1987); *accord LiButti v. United States*, 107 F.3d 110, 123 (2d Cir.1997); *F.D.I.C.* [*v. Fidelity & Deposit Co. of Md.*], 45 F.3d [969]at 978 (5th Cir.1995); *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 277 (3d Cir.1986). A leading case on this issue is *LiButti v. United States* from the Second Circuit. *LiButti* recognized, as we do here, that the 'overarching concern' that should guide the admissibility inquiry 'is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth.' 107 F.3d at 124. After surveying pertinent cases from the other circuits, *LiButti* identified four non-exclusive factors for courts to consider: (1) 'the nature of the relevant relationships'; (2) 'the degree of control of the party over the nonparty witness'; (3) 'the compatibility of the interests of the party and non-party witness in the outcome of the litigation'; and (4) 'the role of the non-party witness in the litigation.' *Id.* at 123–24 (capitalization altered). *LiButti* made clear that these factors should be applied flexibly and that an invocation is not barred even if not all of the factors are satisfied. *See id.* We agree with and adopt the *LiButti* analysis - i.e., that the admissibility of a nonparty's invocation of the Fifth Amendment privilege and the

concomitant drawing of adverse inferences should be considered by courts on a case-by-case basis. We also agree that *LiButti's* non-exclusive factors should be applied flexibly and that the overarching concern is whether the adverse inference is trustworthy under all of the circumstances.

*Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1310-11 (11 Cir. 2014); *see also S.E.C. v. Durante*, 2013 WL 6800226, at *10 (S.D.N.Y., Dec. 19, 2013), Report and Recommendation adopted by 2014 WL 5041843 (S.D.N.Y., Sep. 25, 2014); *Putnam Resources v. Pateman*, 757 F. Supp. 157, 167-68 (D.R.I., 1991).

From all that appears the First Circuit has yet to weigh in on this issue.

### IV. The Consequences of the Invocation of the Fifth Amendment by Geronimo in the Instant Case

Applying the law as set forth above to the instant case, the Court could draw an adverse inference from Geronimo's invocation of the Fifth Amendment when asked questions at his deposition relating to the trip to the Dominican Republic on August 13, 2002, the seized currency, or the facts surrounding the seizure. The evidence reveals that Geronimo was the claimant's "boyfriend" and lived with her. (Tr. 72)  He also was involved in her "shipping venture" whereby people would, for a fee, have the claimant ship goods to people in the Dominican Republic in containers.  (Tr. 73, 75-76)  He kept a record of the items being shipped. (Tr. 75)

Thus, the nature of the relationship between the claimant and Geronimo

was close; the claimant testified that the shipping business was hers so the Court infers from the evidence that she controlled Geronimo's actions *vis-a-vis* the business. Geronimo's role was that of a helper or assistant to the claimant in the business. Further, the Court infers from the evidence that their interests were compatible. The Court further rules that the application of the adverse inference in these circumstances would be trustworthy.

This does not end the matter. The issue remains as to what questions posed to Geronimo should the Court infer that the answer, if the privilege were not invoked, would be adverse to the claimant? The problem is that Geronimo's deposition was not admitted into evidence, and the only information as to what happened in the deposition is what is contained in the stipulation, i.e., that he ". . . repeatedly refused to answer questions relating to this trip, the seized currency or the facts surrounding the seizure of the money, asserting his Fifth Amendment right against self-incrimination." (#30, p. 1, ¶ 2) The way the adverse inference works is that if a witness refuses to answer a question by invoking the Fifth Amendment, the Court can draw an inference that the answer *to that question* would be adverse to the claimant. But it is not possible to draw a sort of blanket adverse inference on the ground that the witness

refused to answer questions on a particular subject matter. If the Assistant U.S. Attorney wanted the Court to draw an adverse inference, she was under an obligation to present to the Court the specific questions as to which to apply the inference that the answer would be unfavorable to the claimant. Hence no adverse inference will be draw in this case based on Geronimo's invocation of the Fifth Amendment.

## V. The Merits

This leads to the Court's ultimate disposition of this case. It is admittedly a circumstantial case, and the end result will depend on the weight the Court gives to various pieces of evidence and the inferences the Court chooses to draw from facts which it has found have been proven. It is to be recalled that the burden is on the Government to prove by a preponderance of the evidence that the "[c]urrency constitutes money furnished or intended to be furnished by a person in exchange for a controlled substances, in violation of Title 21, proceeds traceable to such an exchange, and/or money used or intended to be used to facilitate a violation of Title 21." (#1, pp. 1-2) *See* Title 21 U.S.C. §881(a)(6). And in such a circumstance, " . . . the Government must establish that there was a substantial connection between the property and the offense." Title

18 U.S.C. § 983(c)(3). This means that the Government must establish by a preponderance of the evidence that there is a "substantial connection" between the currency and a narcotics offense.

In this case, there is no question but that it has been shown that the claimant's credibility is significantly impaired. But there are some consistent elements to her testimony as to the source of the cash which was seized and some extrinsic evidence to back up those elements.

For example, Baez has been fairly consistent in stating that $35,000 of the cash came from Ms. McKenna. (#30, pp. 9-10, ¶¶ 20, 21)(Tr. 69-70) Ms. McKenna corroborated the fact that she had given the claimant $35,000. (#30, p. 11, ¶ 23) The testimony is further corroborated by the Partnership Agreement between the claimant and Ms. McKenna dated July 5, 2002 whereby it is recited that Ms. McKenna gave the claimant $35,000 pursuant to the agreement. (Exh. 20)

Further, Baez has been fairly consistent in claiming that some of the money came from her business of shipping containers to the Dominican Republic. (#30, pp. 9-10, ¶¶ 20, 21)(Tr. 67) She testified that some of the money was to pay fees and duties in order to claim the container at the port of Santo Domingo when it arrived there. (Tr. 67-68) This testimony is

corroborated by the stipulation (#30, p. 14, ¶ 31) to the effect that Geronimo shipped a contained on August 8, 2002 to the Dominican Republic which the Court infers is the same container about which the claimant testified.

In making these points, the Court is not finding that all of these transactions were legal. In view of some of the claimant's past actions with respect to her residence, her false claims of poverty, the significant amount of funds which were going in and out of her bank accounts, her apparent understatement of income on her tax returns, and the inconsistencies among her prior statements, the Court would not be surprised if there was some wrongdoing connected to the currency at issue.

However, the Court rules that the evidence does not support a finding by a preponderance of the evidence that there is a *substantial* connection between the currency and a narcotics violation. True, the dog alerted to the odor of one of four illegal narcotics, but that is really the only credible evidence of a connection. While the Dominican Republic may be a source of drugs and money laundering, it is also the claimant's home country where she has family. Lastly, it would be highly unusual for someone transporting drug money to disclose voluntarily the fact that she is carrying cash and to ask for a form to

document the fact that she is transporting cash out of the United States.

## VII. Conclusion and Order

From a review of all the evidence, the Court rules that the Government has failed to prove by a preponderance of the evidence that there is a *substantial* connection between the currency and a narcotics violation as required by 18 U.S.C. § 983(c)(3). The Clerk is directed to enter Final Judgment enter for the claimant. SO ORDERED.

/s/ *Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

Date: January 20, 2015.